UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TREVOR L. VERNON AND ARGENT CAPITAL MANAGEMENT, LLC,**<br><br>**Defendants.** | **Case No. 1:26-cv-197** |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), an independent federal agency, by and through its attorneys, for its Complaint against defendants Trevor L. Vernon ("Vernon") and Argent Capital Management, LLC ("ACM") (collectively, "Defendants"), alleges as follows:

## I. SUMMARY

1. From at least March 17, 2022 through at least February 4, 2026 (the "Relevant Period"), Vernon, individually, and ACM, by and through Vernon, its controlling person, fraudulently solicited and accepted over $14 million from at least 60 individuals and entities ("participants") to invest in a commodity pool called Argent Capital Partners, LP (the "Fund"), operated by ACM. Defendants managed and controlled the Fund and used participants' funds to trade equity index futures contracts, options on equity index futures, and crypto assets, among other purported investments.

2. During the Relevant Period, Defendants made numerous false and misleading statements to lure new participants and convince existing participants to maintain or increase their contributions to the Fund. These misrepresentations included claims that Vernon was a successful trader and the Fund was extraordinarily profitable when in fact Vernon's trading of futures and options using participant funds resulted in consistent and catastrophic losses. Defendants made such claims, in part, by making false statements to existing and prospective participants through quarterly account updates, Schedule K-1 tax forms, a periodic "Performance Summary," and monthly Fund performance recap emails.

3. Defendants also misappropriated some of the participants' funds, including by using some of these funds to pay other participants in the nature of a Ponzi scheme in order to hide the Fund's losses and conceal Defendants' fraud.

4. In addition, Vernon made false or misleading statements to the Commission during its investigation of this matter.

5. Throughout the Relevant period, ACM acted as a commodity pool operator ("CPO"). ACM was not registered with the CFTC, as required by the Commodity Exchange Act ("Act"). By soliciting investments for the Fund on behalf of ACM, Vernon acted as an associated person ("AP") of ACM without being registered with the CFTC, as required by the Act.

6. By engaging in this conduct and the conduct further described herein, Defendants violated Sections 4b(a)(1)(A)-(C), 4c(b), 4k(2), 4m(1), 4*o*(1)(A) and (B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), 6k(2), 6m(1), 6*o*(1)(A) and (B), and 9(1), and Commission Regulations ("Regulations") 3.12(a), 33.10, and 180.1(a)(1)-(3), 17 C.F.R. §§ 3.12(a), 33.10, and 180.1(a)(1)-(3) (2025), and Vernon violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2).

7. Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint and similar acts and practices, as described below.

8. The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and Regulations. The Commission also seeks civil monetary penalties, restitution for participants, disgorgement, trading and registration bans, pre- and post-judgment interest, and such other equitable and ancillary relief as this Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that U.S. district courts "shall have jurisdiction to entertain such actions."

10. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this district. In addition, during the Relevant Period, Vernon resided in this district, and ACM had its principal place of business in this district.

## III. THE PARTIES

11. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations.

12. Defendant **Trevor L. Vernon** is a resident of Franklin, North Carolina. During the Relevant Period, Vernon acted as an AP of ACM, a CPO. From February 9, 2017 to May 6, 2020, Vernon was listed as a principal with the National Futures Association and registered with the CFTC as an AP of Argent Capital Trading, LLC. Vernon has never been registered with the CFTC in any other capacity.

13. Defendant **Argent Capital Management, LLC** is a Delaware limited liability company formed on or about March 11, 2022, with its principal place of business in Franklin, North Carolina. ACM is the general partner of the Fund. ACM is controlled by Vernon, who is the sole owner of ACM. ACM has never been registered with the CFTC in any capacity.

## IV. FACTS

### A. Defendants Engaged in Commodity Pool Fraud.

14. During the Relevant Period, Vernon, individually and on behalf of ACM, solicited at least $14.8 million from more than 60 participants to be invested in the Fund.

15. Defendants began accepting participant deposits for investment in the Fund by at least March 17, 2022.

16. Vernon instructed participants how to transfer their money to the Fund. For wire transfers, participants were instructed to route funds directly to a bank account held in the name of the Fund and controlled by Vernon. Other participants provided funds via personal checks made out to the Fund, which were deposited into the same bank account.

17. Vernon represented to participants in his monthly Fund performance emails that the Fund would invest in "equity markets, index and stock option derivatives, real estate, debt, cryptocurrency, the blockchain, and private companies."

### 1. Defendants' Trading of Fund Assets Resulted in Substantial and Consistent Losses.

18. Between June 2022 and January 2025, Defendants deposited a net total of approximately $4.2 million of participant funds into a trading account in the name of Vernon and his spouse at Broker 1. During this period, Vernon primarily traded futures and options on futures in the S&P 500, Nasdaq, and Russell 2000 indexes at Broker 1. Vernon's trading was consistently unsuccessful, resulting in trading losses of approximately $3.9 million.

19. On or about February 4, 2025, Broker 1 closed Vernon's account following an internal compliance review of activity in the account deemed by Broker 1 to be suspicious.

20. Vernon subsequently began trading in an account at Broker 2 held in the name of Vernon and his spouse. Between February 14, 2025 and February 4, 2026, Vernon deposited approximately $4.7 million of participant funds into the account at Broker 2. During this period, Vernon primarily traded options on futures in the S&P 500 and Nasdaq indexes and, once again, his trading was consistently unsuccessful, resulting in trading losses of approximately $4.7 million.

21. During the Relevant Period, Defendants deposited a net total of at least $446,000 of participant funds into Vernon's personal accounts at Crypto Asset Exchanges 1 and 2. Vernon's trading of these funds, including transactions in bitcoin and ether, which are commodities, resulted in at least $108,000 in losses.

22. Cumulatively, during the Relevant Period, Defendants deposited a net total of approximately $9.3 million of participant funds into Vernon's trading accounts at Brokers 1 and

2 and Crypto Asset Exchanges 1 and 2, and his trading of futures, options, and crypto assets in those accounts resulted in total trading losses of more than $8.6 million.

23. During the Relevant Period, Defendants never disclosed these losses to existing or prospective participants.

### 2. Defendants Made Fraudulent Representations and Issued False Statements to Participants.

24. Vernon, individually and on behalf of ACM, solicited existing and prospective participants by word of mouth, in-person meetings, email, and other means or instrumentalities of interstate commerce. In his solicitations, Vernon claimed he was a successful trader.

25. Vernon, as the sole owner of ACM, exercised ultimate authority over ACM, was the control person for ACM, and was responsible for the content and dissemination of all ACM- and Fund-related documents, oral and written communications, and information about the Fund provided to existing and prospective participants.

26. Throughout the Relevant Period, and as described below, Defendants misrepresented the Fund's performance to solicit new participants, to lull current participants into maintaining their Fund investments, and to induce participants to invest more.

27. Defendants created and distributed numerous documents and communications claiming the Fund had exceptionally positive investment performance, when in fact it did not.

28. For example, Defendants sent to prospective participants documents titled "Performance Summary" (or a similar title) that showed monthly and annual returns of the Fund and compared those returns to the S&P 500 and Nasdaq indices. Each of these summaries falsely represented the Fund was profitable almost every month and consistently outperformed both the S&P 500 and the Nasdaq.

29. Defendants provided false performance results to existing participants in quarterly account updates. These updates, which appeared to be screenshots from a spreadsheet, reported positive returns in the participants' accounts and ever-increasing account balances based on purported gains from Vernon's management of the Fund's assets.

30. In addition to the quarterly account updates, Defendants frequently sent emails to existing and/or prospective participants highlighting the Fund's purported performance for the preceding month. For example, a June 9, 2025 email stated the Fund "ended May [2025] with a +7.03% return for the month, and +9.76% return YTD, after fees and expenses."

31. In reality, Defendants' internal records for the Fund reflect no positive rate of return in May 2025, and account statements for Vernon's trading account at Broker 2 show over $320,000 in *losses* trading futures and options that month. Further, the futures and options trading Vernon conducted in his trading accounts at Brokers 1 and 2 from January 2025 through May 2025 resulted in losses exceeding $2.8 million, contravening the +9.76% year-to-date return Defendants reported to participants.

32. Defendants also distributed to participants Schedule K-1 tax forms reflecting annual profits purportedly earned by participants from their investments in the Fund when in fact no such profits were earned.

33. A reasonable investor would have understood from these documents and communications that Defendants' management of Fund assets was extraordinarily profitable and that participants' investments in the Fund were increasing in value.

34. In fact, the purported gains and Fund participant balances reflected in these documents and communications were false. As described above, Defendants lost millions of dollars of participant funds trading futures, options, and crypto assets during the Relevant Period.

Furthermore, Defendants' internal accounting records for the Fund do not support Defendants' representations of profits.

35. Existing and prospective participants relied on Defendants' representations about the Fund's performance in deciding whether to participate or remain in the Fund.

36. For example, in March 2022, Vernon met with a prospective participant ("Participant 1") and showed Participant 1 performance reports falsely representing the Fund was outperforming the S&P 500. On or about May 20, 2022, Participant 1 sent Defendants $80,000 for investment in the Fund, relying in part on the false performance returns Vernon previously communicated to Participant 1 in March.

37. Between October 17, 2022 and July 28, 2023, Defendants sent seven emails to Participant 1, each of which falsely stated the Fund maintained positive year-to-date performance and consistently outperformed the S&P 500 and Nasdaq. On or about September 19, 2023, Participant 1 sent Defendants another $50,000 for investment in the Fund, relying in part on the false performance returns contained in the emails.

38. Each of the above statements regarding the performance of the Fund was false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the performance of the Fund were false and misleading. Vernon, as the sole owner of ACM with sole control over the trading and bank accounts utilized for the Fund, would have known the actual performance numbers and knew that the representations made to participants were false.

39. The above misrepresentations regarding the performance of the Fund were material to existing and prospective participants because, among other things, participants consider a pool operator's historical performance to be relevant to the probability that a pool

operator may perform well in the future. Moreover, ongoing performance updates were material to participants' decisions to maintain or increase their investments in the Fund.

**3. Defendants Misappropriated Participants' Funds.**

40. Of the approximately $14.8 million Defendants collected from participants during the Relevant Period, Vernon lost at least $8.6 million trading futures, options, and crypto assets. Vernon also lost participant funds trading securities at Broker 1 and Broker 2. Vernon sent over $800,000 of participant funds to businesses associated with real estate development and transferred additional participant funds to other accounts and third parties, including money loaned to a business and various individuals (including Vernon himself). At least some of the funds used for securities trading, the real estate development businesses, and the loans may have been intended as investments for the Fund. Vernon's internal records for the Fund reflect no positive cash flow generated from those investments.

41. Of the remaining funds, ACM, acting through Vernon, returned over $3 million to participants, some or all of which was paid out in a manner akin to a Ponzi scheme (*e.g.*, by paying false profits to participants or using new participant money to pay old participants). In addition to misappropriating funds via Ponzi payments, Vernon misappropriated $136,000 for private air travel.

**B. Vernon Made False or Misleading Statements to the CFTC.**

42. On January 15, 2026, Vernon provided sworn testimony before officers of the Commission concerning the subject matter of this Complaint.

43. During his testimony, Vernon made false statements of material fact concerning whether the Fund was profitable and the source and use of funds in his accounts at Broker 1 and Broker 2.

### 1. Vernon Falsely Testified to Commission Officers That the Fund Was Profitable.

44. In response to questions from Commission officers, Vernon testified under oath that the Fund was profitable each year "on an annual basis," including from 2023 through 2025.

45. Vernon further testified that the Fund's return between January and September 2025 was "probably in the 15 percent [sic] or so" and that the Fund's profits "over the last couple of years" were around 18-20% "[w]hen accruing everything."

46. Vernon's testimony was false because, as Vernon knew or reasonably should have known, trading records from his accounts at Broker 1 and Broker 2 show millions of dollars in annual losses from 2022 to 2025, Vernon's internal business records show that no other Fund assets generated returns, and the Fund's bank statements do not reflect the deposit of any realized profits from the Fund.

47. Based on these records and Defendants' control of the Fund and Fund assets, Vernon knew or reasonably should have known that his testimony was false or misleading. Furthermore, when given the opportunity to produce supporting documentation for the positive performance results Defendants reported to participants, Vernon was unable to do so.

### 2. Vernon Falsely Testified to Commission Officers About His Use and Source of Deposits in His Trading Accounts.

48. In response to questions from Commission officers, Vernon testified under oath that his account at Broker 1 was for "personal investments," that he never used this account for "business investments," and that the source of deposits in this account was his personal funds.

49. Vernon also testified that the source of deposits into his account at Broker 2 was his personal funds.

50. Vernon's testimony was false because, as Vernon knew or reasonably should have known, Defendants' bank and personal trading account records show that the trading accounts at Broker 1 and Broker 2 were funded directly or indirectly by funds from the Fund's bank account, which contained the participants' funds. Furthermore, Defendants' internal business records list the account at Broker 1 as an asset of the Fund.

51. Based on these records and Defendants' control of the Fund and Fund assets, Vernon knew or reasonably should have known that his testimony was false or misleading.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### Violations of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) Fraud in Connection with Futures Contracts

52. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

53. 7 U.S.C. § 6b(a)(1)(A)-(C) makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

54. During the Relevant Period and as described above, in connection with contracts of sale of commodities in interstate commerce and futures contracts made, or to be made, on or subject to the rules of a designated contract market for or on behalf of other persons, Defendants violated 7 U.S.C. § 6b(a)(1)(A)-(C) by, among other things, falsely claiming to participants that Vernon ran a profitable commodity pool, issuing false performance results to participants, and misappropriating participant funds, including by using some participants' funds to pay other participants in the nature of a Ponzi scheme.

55. Defendants directly engaged in the acts and practices described above willfully, knowingly, or recklessly.

56. Vernon directly or indirectly controlled ACM and did not act in good faith or knowingly induced, directly or indirectly, ACM's violations as alleged in this Count. Accordingly, Vernon is liable for ACM's violations of 7 U.S.C. § 6b(a)(1)(A)-(C) as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

57. Vernon's acts alleged herein occurred within the scope of his employment, office, or agency with ACM. Accordingly, ACM is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2 (2025) for Vernon's acts in violation of 7 U.S.C. § 6b(a)(1)(A)-(C).

58. Each act of misappropriation, misrepresentation of a material fact, issuance of a false statement, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6b(a)(1)(A)-(C).

## COUNT TWO

## Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10, 17 C.F.R. 33.10 (2025)
## Fraud in Connection with Commodity Options

59. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

60. 7 U.S.C. § 6c(b) provides that no person shall offer to enter into, enter into or confirm the execution of any transaction involving any option transaction contrary to any regulation of the Commission.

61. 17 C.F.R. § 33.10 (2025) makes it unlawful for any person, in connection with an option transaction, directly or indirectly, "(a) [t]o cheat or defraud or attempt to cheat or defraud any other person; (b) [t]o make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; [or] (c) [t]o deceive or attempt to deceive any other person by any means whatsoever[.]"

62. During the Relevant Period and as described above, in connection with options on futures contracts, Defendants violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10 (2025) by, among other things, falsely claiming to participants that Vernon ran a profitable commodity pool, issuing false performance results to participants, and misappropriating participant funds, including by using some participants' funds to pay other participants in the nature of a Ponzi scheme.

63. Defendants directly engaged in the acts and practices described above willfully, knowingly, or recklessly.

64. Vernon directly or indirectly controlled ACM and did not act in good faith or knowingly induced, directly or indirectly, ACM's violations as alleged in this Count.

Accordingly, Vernon is liable for ACM's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10 (2025) as a controlling person pursuant to 7 U.S.C. § 13c(b).

65. Vernon's acts alleged herein occurred within the scope of his employment, office, or agency with ACM. Accordingly, ACM is liable under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2025) for Vernon's acts in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10 (2025).

66. Each act of misappropriation, misrepresentation of a material fact, issuance of a false statement, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10 (2025).

## COUNT THREE

### Violations of Sections 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B)
### Fraud and Deceit by a Commodity Pool Operator

67. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

68. A commodity pool is defined in Section 1a(10)(A) of the Act, 7 U.S.C. § 1a(10)(A) as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any—(i) commodity for future delivery . . . [or] (iii) commodity option . . . ."

69. A CPO is defined in Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i) as "any person . . . engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities or property . . . for the purpose of trading in commodity interests, including any—(I) commodity for future delivery . . . [or] (III) commodity option . . . ."

70. During the Relevant Period, ACM acted as a CPO and made use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO by

engaging in a business that is of the nature of a commodity pool, and, in connection therewith, soliciting, accepting and/or receiving funds from others for a pooled investment vehicle that engages in commodity futures and options transactions.

71. An AP of a CPO is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2025) as any "(3) . . . partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) [t]he solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]"

72. During the Relevant Period, Vernon acted as an AP of a CPO, by soliciting, accepting, or receiving funds from others for the purpose of trading in commodity interests in the Fund.

73. 7 U.S.C. § 6*o*(1)(A) and (B) make it unlawful for a CPO or an AP of a CPO, whether registered with the Commission or not, "by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

74. During the Relevant Period and as described above, ACM, acting as a CPO, and Vernon, acting as an AP of a CPO, while using the mails or other means or instrumentality of interstate commerce, violated 7 U.S.C. § 6*o*(1)(A) and (B) by, among other things, falsely claiming to participants that Vernon ran a profitable commodity pool, issuing false performance results to participants, and misappropriating participant funds, including by using some participants' funds to pay other participants in the nature of a Ponzi scheme.

75. By engaging in the acts and practices described above, Defendants: (1) willfully, knowingly, or recklessly employed devices, schemes, or artifices to defraud participants; or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon participants.

76. Vernon directly or indirectly controlled ACM and did not act in good faith or knowingly induced, directly or indirectly, ACM's violations as alleged in this Count. Accordingly, Vernon is liable for ACM's violations of 7 U.S.C. § 6*o*(1)(A) and (B) as a controlling person pursuant to 7 U.S.C. § 13c(b).

77. Vernon's acts alleged herein occurred within the scope of his employment, office, or agency with ACM. Accordingly, ACM is liable under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2025) for Vernon's acts in violation of 7 U.S.C. § 6*o*(1)(A) and (B).

78. Each act of misappropriation, misrepresentation of a material fact, issuance of a false statement, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A) and (B).

## COUNT FOUR

### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. §180.1(a)(1)-(3) (2025)
### Fraud in Connection with Crypto Assets

79. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

80. 7 U.S.C. § 9(1) makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any . . . contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

81. 17 C.F.R. § 180.1(a) (2025) provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person[.]

82. The crypto assets at issue in this Complaint, including bitcoin and ether, are commodities in interstate commerce pursuant to Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

83. During the Relevant Period, and as described above, in connection with contracts for future delivery and contracts of sale of commodities in interstate commerce, Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025) by, among other things, falsely claiming to participants that Vernon ran a profitable commodity pool, issuing false performance results to participants, and misappropriating participant funds, including by using some participants' funds to pay other participants in the nature of a Ponzi scheme.

84. Defendants directly engaged in the acts and practices described above intentionally, knowingly, or with reckless disregard for the truth of their representations.

85. Vernon directly or indirectly controlled ACM and did not act in good faith or knowingly induced, directly or indirectly, ACM's violations as alleged in this Count. Accordingly, Vernon is liable for ACM's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025) as a controlling person pursuant to 7 U.S.C. § 13c(b).

86. Vernon's acts alleged herein occurred within the scope of his employment, office, or agency with ACM. Accordingly, ACM is liable under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. §

1.2 (2025) for Vernon's acts in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025).

87. Each act of misappropriation, misrepresentation of a material fact, issuance of a false statement, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2025).

**COUNT FIVE**

**Violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1)**
**Failure to Register as a CPO**

88. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

89. Subject to certain exceptions not relevant here, 7 U.S.C. §6m(1) makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

90. During the Relevant Period, ACM acted as a CPO and made use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO by engaging in a business that is of the nature of a commodity pool, and, in connection therewith, soliciting, accepting and/or receiving funds from others for a pooled investment vehicle that engages in commodity futures and options transactions.

91. ACM engaged in this conduct without being registered with the Commission as a CPO in violation of 7 U.S.C. § 6m(1).

92. Vernon directly or indirectly controlled ACM and did not act in good faith or knowingly induced, directly or indirectly, ACM's violations alleged in this Count. Accordingly, Vernon is liable for ACM's violations of 7 U.S.C. § 6m(1) as a controlling person pursuant to 7 U.S.C. § 13c(b).

## COUNT SIX

**Violations of Section 4k(2) of the Act, 7 U.S.C. § 6k(2), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2025)**
**Failure to Register as an AP of a CPO**

93. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

94. Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) and 17 C.F.R. §3.12(a) (2025) require any person associated with a CPO as a partner, officer, employee, consultant or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool to be registered as an AP of a CPO.

95. During the Relevant Period, Vernon acted as an AP of a CPO by soliciting funds, securities, or property for the Fund. Vernon engaged in this conduct without being registered with the Commission as an AP of CPO ACM, in violation of 7 U.S.C. § 6k(2) and 17 C.F.R. § 3.12(a) (2025).

96. Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) makes it unlawful for a CPO to permit an AP to become or remain associated with the CPO in such capacity if the CPO knew or should have known that such person was not registered.

97. During the Relevant Period, ACM knew or should have known that Vernon was not registered with the Commission as an AP of ACM, and yet allowed Vernon to become or remain associated with ACM as a partner, officer, employee and/or agent in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool in violation of 7 U.S.C. § 6k(2).

98. Vernon directly or indirectly controlled ACM and did not act in good faith or knowingly induced, directly or indirectly, ACM's violations as alleged in this Count. Accordingly, Vernon is liable for ACM's violations of 7 U.S.C. § 6k(2) as a controlling person pursuant to 7 U.S.C. § 13c(b).

99. Vernon's acts alleged herein occurred within the scope of his employment, office, or agency with ACM. Accordingly, ACM is liable under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2025) for Vernon's acts in violation of 7 U.S.C. § 6k(2).

## COUNT SEVEN

### Violations of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2)
### False Statements to the Commission (Vernon only)

100. The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

101. 7 U.S.C. § 9(2) makes it:

> unlawful for any person to make any false or misleading statement of a material fact to the Commission, including in any registration application or any report filed with the Commission under this chapter, or any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

102. On January 15, 2026, Vernon testified under oath before Commission officers.

103. During his testimony, Vernon made false statements of material fact concerning whether the Fund was profitable and the source and use of funds in his accounts at Broker 1 and Broker 2.

104. Vernon knew or reasonably should have known that these statements were false or misleading.

105. Vernon's testimony constituted false or misleading statements of material fact to the Commission, in violation of 7 U.S.C. § 9(2).

106. Each false or misleading statement of a material fact, including but not limited to those specifically alleged herein, is alleged as a separate violation of 7 U.S.C. § 9(2).

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1 and pursuant to its own equitable powers:

A. Enter an order finding that Defendants violated Sections 4b(a)(1)(A)-(C), 4c(b), 4k(2), 4m(1), 4*o*(1)(A) and (B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), 6k(2), 6m(1), 6*o*(1)(A) and (B), and 9(1), and Regulations 3.12(a), 33.10, and 180.1(a)(1)-(3), 17 C.F.R. §§ 3.12(a), 33.10, and 180.1(a)(1)-(3) (2025), and Vernon violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2);

B. Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in conduct in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), 6k(2), 6m(1), 6*o*(1)(A) and (B), and 9(1) and 17 C.F.R. §§ 3.12(a), 33.10, and 180.1(a)(1)-(3) (2025);

C. Enter an order of permanent injunction enjoining Vernon, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in the conduct described above in violation of 7 U.S.C. § 9(2);

D. Enter an order of permanent injunction enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2025)), for accounts held in the name of either Defendant or for accounts in which either Defendant has a direct or indirect interest;

3) Having any commodity interests traded on either Defendant's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2025); and/or

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2025)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the

CFTC except as provided for in Regulation 4.14(a), 17 C.F.R. § 4.14(a)(9) (2025);

E. Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to disgorge pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

F. Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

G. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants and any of the participants whose funds were received by Defendants as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

H. Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to pay civil monetary penalties assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, tit. VII, § 701, 129 Stat.

584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2025), for each violation of the Act and Regulations, as described herein;

I. Enter an order directing that Defendants, as well as any third-party transferee and/or successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to participants and other persons in connection with the operation of the Fund, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least March 17, 2022 to the date of such accounting;

J. Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

K. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: July 7, 2026

Respectfully submitted,

COMMODITY FUTURES TRADING COMMISSION

*<u>/s/ Daniel C. Jordan</u>*
Daniel C. Jordan (VA Bar No. 36382)
(202) 418-5339
djordan@cftc.gov
Cara Gardner (DC Bar No. 1003793)
(202) 418-5579
cgardner@cftc.gov

Division of Enforcement
1155 21st Street NW
Washington, DC 20581